UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MICHAEL E. INMAN, JR.,

    Plaintiff,

v.                                     CAUSE NO. 3:18-CV-248-DRL-MGG

RON NEAL, *et al.*,

    Defendants.

## OPINION AND ORDER

Michael E. Inman, Jr., a prisoner without a lawyer, was granted leave to proceed on an Eighth Amendment claim against Warden Ron Neal, Assistant Warden George Payne, and Captain Derek Boyan in their individual capacities for subjecting him to unsanitary living conditions at the Indiana State Prison—*i.e.*, being housed with birds, mice, and roaches and their excrement. The defendants filed a summary judgment motion (ECF 63) arguing that the undisputed material facts entitle them to judgment as a matter of law. Mr. Inman received notice (ECF 65) of the consequences of failing to respond to the motion, and he filed a response.[1] The motion is now fully briefed and ripe for decision. The court denies summary judgment for Assistant Warden Payne and Captain Boyan, and grants summary judgment for Warden Neal.

## BACKGROUND

Mr. Inman has resided at the Indiana State Prison since August 2013. ECF 64-1 at 10. Mr. Inman asserts that he was housed in an area infested with mice, pigeons, and roaches since late 2013

---

[1] In their reply brief, the defendants argue that Mr. Inman's response brief should be stricken because Mr. Inman did not include a section titled "Statement of Genuine Disputes," as required by this court's local rules, and does not point to specific material that precludes summary judgment. The defendants have made this request outside N.D. Ind. Local Rule 7-1, which requires that motions be filed separately. Taking that into account, but chiefly Mr. Inman's *pro se* status, the court denies the request to strike Mr. Inman's response. *See also* Fed. R. Civ. P. 56(c)(3) (permitting court to consider any other admissible materials in the record).

or 2014. ECF 64-1 at 10, 14-17. When he arrived in D cell house, he indicates that "it was like pigeon heaven at first and then other birds as well. Mice were everywhere as they are now still everywhere." *Id.* at 10, 19. The pigeons and roaches also remained a problem—at least at the time Mr. Inman's deposition was taken. *Id.* at 14, 19, 22. Between December 2017 and June 2018, Mr. Inman regularly observed groups of "30 or better" roaches near the food cart when he went to the shower daily. *Id.* at 23-24. There would be fewer if he showered during the day, but more if he showered in the evening. *Id.* Between December 2017 and June 2018, Mr. Inman estimates that he saw on average fifteen pigeons daily, plus many black birds. *Id.* at 28-29.

Mr. Inman was never bitten by a roach, mouse, or pigeon. ECF 64-1 at 24-25, 31. On December 20, 2017, Mr. Inman filed an informal grievance complaining about pigeon droppings. ECF 36 at 2. A few months later, staff began cleaning up the area. *Id.* Indiana State Prison had a sanitation plan in place throughout the relevant time period. ECF 64-2. The sanitation plan directed daily pigeon waste cleaning and pest control. *Id.* In addition, Indiana State Prison has occasionally brought in specialized equipment, such as high lifts, to assist with sanitation. ECF 62 at 6. Sanitation notes indicate that, in April 2018, mouse traps were being used in the unit, pest control was called to spray the area, and pigeons needed to be removed.[2] ECF 72-1 at 1, 3. A sanitation note from May 2018 says the sanitation detail had been cleaning the unit and needed to pressure wash the walls to remove feces. ECF 72-1 at 6. By July, notes indicated that the situation with the mice had improved, although mice traps were being brought over daily and there were still requests for more. *Id.* at 7-8. By August 2018, however, sanitations notes indicate that there was still a need for mouse traps. *Id.* at 9.

Mr. Inman believes that he suffers from sinus problems, upset stomach, and headaches as a result of being housed with pigeons, mice, and roaches and their excrement and dander. ECF 64-1 at

---

[2] The defendants' reply brief states that the pigeons were removed. ECF 72 at 6-7. The evidence before the court demonstrates only that a staff member indicated that pigeons *needed* to be removed. ECF 72-1 at 2.

2

30-31. Mr. Inman did not have allergies or sinus issues before being housed in an area infested with pigeons, mice, and roaches. *Id.* at 30, 32. According to Mr. Inman, he feels that it is "weird that [he] had breathing problems and [wanted] to vomit and then [had] a constant migraine. Out of the blue [he] would just catch a migraine for some odd reason." *Id.* at 31. Mr. Inman admits, however, that his headaches "could have come from a number of things" aside from the exposure to pigeons, mice, and roaches. *Id.* at 50-51.

Medical records, dated August 2, 2018, indicate that Mr. Inman was experiencing nausea, "possibly as a result of eating too little, or from eating fatty foods." ECF 64-3 at 18-20. The records further indicate that Mr. Inman complained of "headaches, which were not high in frequency (less than 3 per week)" and that he "was encouraged to take OTC medications for common headaches." *Id.* Mr. Inman's medical records include no medical opinions stating that he suffered from an injury as a result of exposure to pigeons, mice, and roaches. ECF 64-3. And, Mr. Inman's medical records include no notes indicating that his prescriptions were related to exposure to pigeons, mice, or roaches. Mr. Inman has been prescribed Tylenol for headaches, and Zyrtec and Singulair for his sinus issues. ECF 64-1 at 7, 71. Mr. Inman does report that, during one of his doctor's visits, he asked why the medications were prescribed, and the doctor responded by indicating that it was "[b]ecause [he] complained about the environmental conditions." *Id.* at 48. Mr. Inman does not allege that he suffered from any psychological harm as a result of the conditions of his confinement. ECF 1.

Mr. Inman stated at his deposition that he sued Warden Neal because "[h]e runs this prison" and "because he runs this prison he should have knowledge of the things going on[.]" ECF 64-1 at 61. Mr. Inman has never personally discussed the issues raised in this litigation with Warden Neal. *Id.* at 61-62. Warden Neal did not respond to any of Mr. Inman's grievances. *Id.* at 61.

Assistant Warden Payne often walked through Mr. Inman's cell house. *Id.* at 62. Mr. Inman attempted to discuss his concerns with Assistant Warden Payne, but he was unsuccessful. *Id.* at 62-63.

3

When Mr. Inman tried to speak to Assistant Warden Payne about the conditions in the cell house, Assistant Warden Payne was at his door for no more than five to ten seconds and, at the same time, inmates throughout the cell house were vying for Assistant Warden Payne's attention and complaining about the environment in the cell house. *Id.* at 64. Mr. Inman yelled to Assistant Warden Payne, "I want to talk to you about these inhumane conditions…[h]ey, the birds are right in front of me. They're fucking. And there are mice in and out." *Id.* at 62-63. Assistant Warden Payne walked away, indicating that the captain or lieutenant would address his concerns, before Mr. Inman could finish sharing his concerns. *Id.* at 64. Assistant Warden Payne has no recollection of any lengthy personal discussions with Mr. Inman and has no recollection of receiving any letters from Mr. Inman. ECF 62 at 6.

Captain Boyan walks through Mr. Inman's cell house "all the time." *Id.* at 65. Mr. Inman and other inmates have complained to Captain Boyan about the pigeons, mice, and roaches. ECF 64-1 at 64-65. Mr. Inman spoke with Captain Boyan twice regarding the subject matter of this litigation, in March 2018 and November 2018, after he filed a grievance in December 2017 that appears not to have resulted in a solution. *Id.* at 54-55, 67-68. In March 2018, Captain Boyan was with Assistant Warden Payne when Mr. Inman tried to address his concerns and Assistant Warden Payne indicated that a captain or lieutenant would deal with it. *Id.* at 62-63. During this conversation, Mr. Inman pointed out the pigeon poop and told him that "if you're here long enough, you'll see some pigeons." *Id.* at 63. During the other conversation, Mr. Inman asked Captain Boyan if they were going to stop the mice, and he responded by indicating that "[w]e can stop them." *Id.* at 66. Still, Captain Boyan never responded to any grievances raised by Mr. Inman. *Id.* at 65.

Mr. Inman did not discuss his medical history with any of the defendants, and the defendants do not have access to Mr. Inman's medical records. *Id.* at 61-62, 64, 67-68.

4

STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. The court will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Id.*

DISCUSSION

The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). In evaluating such a claim, the court conducts an objective and subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective inquiry asks whether the alleged deprivation is "sufficiently serious" that the action or inaction of a prison official leads to "the denial of the minimal civilized measure of life's necessities." *Id.* Although "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), inmates are entitled to adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). For the subjective inquiry, the prisoner must show the defendant acted with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834. The court examines the personal involvement of each prison official in this analysis of the Eighth Amendment claim. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009).

    A.    *On this Record, Mr. Inman Has Established the Personal Involvement of Assistant Warden Payne and Captain Boyan, but not Warden Neal.*

There is no general *respondeat superior* liability under 42 U.S.C. § 1983. *Burks*, 555 F.3d at 596. "[P]ublic employees are responsible for their own misdeeds but not for anyone else's." *Id.* "Only persons who cause or participate in the violations are responsible." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). As this circuit has explained:

> The doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights. Supervisory liability will be found, however, if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. That is, to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct. Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.

*Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citations and internal quotation marks omitted).

As to Warden Neal, Mr. Inman has conceded that he did not talk to him or write him about the conditions in his cell house, and that Warden Neal did not respond to any of his grievances. Thus, Warden Neal was not sufficiently involved for liability to attach, and summary judgment must be granted in his favor.

As to Assistant Warden Payne, Mr. Inman asserts that he tried to raise these issues with him. Over a period of just five to ten seconds, with other inmates vying for the Assistant Warden's attention, Mr. Inman yelled, "I want to talk to you about these inhumane conditions…[h]ey, the birds are right in front of me. They're fucking. And there are mice in and out." ECF 64-1 at 62-63. Other inmates were complaining about the inhuman environment at that time too. *Id.* at 64. Assistant Warden Payne walked away before Mr. Inman could finish sharing all his concerns. *Id.* Mr. Inman described the Assistant Warden's reaction to what he shared as getting "like a middle finger." *Id.* Mr. Inman also testified, however, that Assistant Warden Payne said that the Captain or Lieutenant would address Mr. Inman's concerns. *Id.* While Mr. Inman may view Assistant Warden Payne's response as lending less than a long ear, the undisputed facts demonstrate that the Assistant Warden did not condone the conditions or turn a blind eye to them in that instance. *See Chavez*, 251 F.3d at 651. He arguably directed that they be addressed. That said, the record establishes triable disputes over when the sanitation issue was addressed, and whether Assistant Warden Payne was aware that his direction went ignored such that he condoned it thereafter, given the weekly reports of ongoing issues and Mr. Inman's testimony that Assistant Warden Payne "walked the cell house a lot of times." ECF 64-1 at 62. While the evidence may not be overwhelming on this front, all reasonable inferences must be given to Mr. Inman on this record.

Captain Boyan cannot be dismissed on this record. Mr. Inman alleges that he discussed his concerns with Captain Boyan on at least two occasions—once in March 2018 when Captain Boyan accompanied Assistant Warden Payne on his walk through and was directed to address the issue (ECF 64-1 at 62-63) and once in November 2018 when Mr. Inman asked Captain Boyan whether the prison was even capable of stopping the infestation of mice and roaches, which Captain Boyan assured him could be done (*Id.* at 66-68). Mr. Inman testified that Captain Boyan walked his cell block "all the time." *Id.* at 65. Based on these affirmative complaints, Captain Boyan's frequent visits to the cell block, and Mr. Inman's description of a prevalent infestation of pigeons, mice, and roaches, a reasonable factfinder could conclude that Captain Boyan was personally involved and well aware of a condition that posed a serious risk of harm if left unredressed.

For these reasons, the court must grant summary judgment for Warden Neal, but not Assistant Warden Payne or Captain Boyan.

B. *Mr. Inman Has Established a Triable Issue on Whether the Unsanitary Conditions from Pests and Vermin Posed a Sufficiently Serious Deprivation of a Constitutionally Adequate Prison.*

Courts assessing the objective severity of prison conditions must consider their nature, duration, and the harm caused to the plaintiff. *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012). "Depending on how extensive the infestation of a prisoner's cell is, what the infesting pests are, what odors or bites or risk of disease they create, what particular psychological sensitivities the prisoner was known to have . . . and how long the infestation continues, a trier of fact might reasonably conclude that the prisoner had been subjected to harm sufficient to support a claim of cruel and unusual punishment." *Id.* His damage could be a disease, psychological harm, or probabilistic harm. *Id.* at 615.

The exposure's duration is one key factor to consider. A short-term problem may not violate the Constitution while long-term exposure may. *See Gray v. Hardy*, 826 F.3d 1000, 1007-08 (7th Cir. 2016); *White v. Monohan*, 326 F. App'x 385, 388 (7th Cir. 2009) ("close case" whether five-year exposure to roaches, mice, bees, and wasps that stung plaintiff and caused scars stated a claim of

8

unconstitutional conditions of confinement). Over an adequate duration, "harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Thomas*, 697 F.3d at 615; *accord Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) ("prolonged pest infestation, specifically a significant infestation of cockroaches and mice," may be considered a deprivation sufficient to constitute a constitutional violation); *Davis v. Williams*, 216 F. Supp. 3d 900, 907-08 (N.D. Ill. 2016) (same).

In *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996), a prisoner alleged that cockroaches and mice were "everywhere," "crawling on his body," "constantly awakening him," and "causing the environment to be unsanitary." He alleged that the prison received only two pest-control sprays over sixteen months. *Id.* The district court dismissed the claim based on the periodic sprayings, but the Seventh Circuit reversed, holding that two sprayings in sixteen months "may have been seriously insufficient" and did not "necessarily show that the defendants were less than deliberately indifferent." *Id.* The court stated that, as alleged, the pest infestation constituted "a prolonged deprivation seriously impacting on [the plaintiff's] health" that "should not have been dismissed." *Id.*; *see also Gray*, 826 F.3d at 1007 (pest infestation resulting in exacerbated asthma, "skin breakouts," and psychological harm sufficiently serious).

In *Sain*, 512 F.3d at 889, an inmate (civilly committed) alleged that his cell "was infested with roaches." Over six years, he said he "saw roaches crawling around his cell," and "coming from under his bed and out of cracks in the wall and sink," and that "he was bitten by a cockroach twice." *Id.* at 889, 894. An exterminator visited his cell "every month or month and a half" or in specific response to his complaints. *Id.* at 894. Under such conditions of treatment, this circuit held that, while his detention was "certainly unpleasant," it did not rise to the level of a constitutional violation to withstand summary judgment. *Id.*; *see also Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (allegations of "mere presence of laundry list of pests" without contact with plaintiff's person or property or claims of physical, psychological, or property damage not sufficiently serious).

9

Mr. Inman testified at his deposition that he was exposed to an infestation since 2013, although the severity of the conditions changed, as he was sometimes housed in areas where the infestation was not as serious. Still, he testified that the mice are "constantly in and out," that pigeons "were in [his] face daily," that a big cockroach crawled on him, and that he was "breathing in constant filth from animals that shouldn't even be in the environment with humans." ECF 64-1 at 31, 68-69. Inspection reports (signed by various prison officers) from at least December 2017 to March 2018 reflect that birds "are leaving feces everywhere," mice were prevalent, sanitation detail needed to be completed, and pressure washing was needed to remove excrement from the walls. ECF 70-1. Mr. Inman contends that the prison permitted, from 2013-2018, pigeons, other birds, mice, and roaches to "go wild" within his cell block. ECF 70 at 1. Between December 2017 and June 2018, Mr. Inman regularly observed groups of "30 or better" roaches near the food cart when he went to the shower daily. ECF 64-1 at 23-24.

While Mr. Inman acknowledges that the Indiana State Prison has a sanitation policy, he asserts that areas have not been cleaned in a "really long time" and "feces of birds and pigeons [have been] left everywhere." ECF 70 at 3. According to his discovery, Mr. Inman says this sanitation plan and any attempts to clean the areas occurred only "months later" after his December 2017 grievance. ECF 36 at 2-3. The Indiana State Prison's sanitation plan, apparently in effect since at least September 28, 2007, contemplates "daily pigeon waste cleaning" and "pest control." ECF 64-2. One might wonder what conditions must exist to call for "daily pigeon waste cleaning," but the point for this case is that the defendants have offered no evidence on this record that Indiana State Prison followed this policy. Indeed somewhat troubling, they casually seem to acknowledge that no cleaning of Mr. Inman's area occurred until months after his grievance, notwithstanding the conditions. ECF 64 at 10. The defendants note that at one point the Indiana State Prison brought in outside high lifts to assist with

cleaning (ECF 62 at 6), but offer no facts as to when this occurred, how often, or whether it even addressed the conditions of vermin and excrement.

The defendants argue that the harm to Mr. Inman was "nominal." ECF 64 at 10. However they choose to characterize it, that is not to say there wasn't any harm, and indeed Mr. Inman says he had problems breathing and sinus issues that began in December 2017. ECF 64-1 at 46. He had the urge to vomit. *Id.* at 31. He also had a constant migraine, though he recognizes that his headaches could be from a "number of things." *Id.* at 31, 50-51. He has been prescribed both over the counter medications (Tylenol and Zyrtek) and a prescription medication (Singulair) for these conditions. *Id.* at 7, 71. "A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The health problems that Mr. Inman attributes to the conditions at the prison have been both diagnosed and treated by prison medical staff. Thus, a reasonable factfinder could conclude that Mr. Inman's conditions were objectively serious.

The defendants argue that Mr. Inman lacks any medical opinion about the cause of his ailments; but, while it would be better if the plaintiff had an expert opinion regarding causation, in this case he need only establish a common sense link between the conditions at the prison and his medical conditions to survive summary judgment. *See Gray*, 826 F.3d at 1007. That common sense link is not a stretch. *See Thomas*, 697 F.3d at 615 (citing numerous articles); *see, e.g.,* Jacqueline P. Jacob *et al.*, *Avian Diseases Transmissible to Humans*, Univ. of Fla. Inst. of Food and Agr. Sciences, 5 (August 1997) ("Allergic alveolitis, also known as pigeon breeder's lung, [is] caused by reduced lung capacity due to a hypersensitivity reaction to feathers, dander, or fecal dust. . . . Chronic, low-grade exposure is more serious, and symptoms may be mistakenly attributed to a stubborn cold or flu."); Scott H. Sicherer & Peyton A. Eggleston, "Environmental Allergens," *Current Clinical Practice: Allergic Diseases: Diagnosis and*

11

*Treatment* 39 (3d ed. 2007) ("cockroaches . . . are common triggers of allergic responses"); L. Curtis *et al.*, *Pigeon Allergens in Indoor Environments: A Preliminary Study*, 57 Allergy 627, 627-29 (2002) ("considerable quantities of pigeon allergens can be present in wild pigeon-infested schools and other environments" such that even "less intensive exposure to wild pigeons can cause hypersensitivity reactions . . . . Recent studies have demonstrated that high exposures to cockroach and mouse allergens often occur in inner-city dwellings, and that exposure to cockroach and mouse allergens are associated with higher asthma rates."); David Peden & Charles E. Reed, *Environmental and Occupational Allergies*, 125 J. Allergy Clin. Immun. S150, S151 (2010) ("Cockroaches represent another significant source of allergens. . . . Mouse allergens are present in urine. . . . Rodent urine is easily aerosolized, and thus rodent allergens can be found in smaller particles . . ., which can be suspended in ambient air."); Gillian Bassirpour & Edward Zoratti, *Cockroach Allergy and Allergen-Specific Immunotherapy in Asthma: Potential and Pitfalls*, 14 Curr. Opin. Allergy Clin. Immunology 535-41 (2014) ("Cockroach exposure has been linked to subsequent cockroach sensitization and allergic respiratory symptoms."); Sudha Shrikant Deo *et al.*, *Identification of Different Pigeon Allergens and Its Trigger Toward Increase in Inner City Asthma*, 28 Indian J. of Allergy, Asthma & Immun. 40-46 (2014) ("Upon exposure, allergic reactions to breathing pigeon feces are common. The dust of dried droppings irritates the nasal passages, causing sneezing, coughs, excess mucus and shortness of breath, dizziness and a sense of vertigo."); Keels S. Jorn *et al.*, *Polly Can Make You Sick: Pet Bird-Associated Diseases*, 76 Cleveland Clin. J. Med. 235-43 (2009) ("Many of these diseases are transmitted by ingestion of food contaminated by avian fecal matter or inhalation of contaminated dust. Therefore, bird owners should take steps to minimize dander in the environment."); Richard D. Cohn *et al.*, *National Prevalence and Exposure Risk for Mouse Allergen in US Households*, 113 J. Allergy Clin. Immun. 1167-71 (2004) ("Exposure to rodent allergens and associations with asthma or allergic diseases have been characterized with increasing clarity through focused observational studies of specific populations"); *see also Pet Dander*, Am. Lung Ass'n (July 1, 2019),

https://www.lung.org/our-initiatives/healthy-air/indoor/indoor-air-pollutants/pet-dander.html (flecks of skin and proteins found in saliva, urine, and feces of animals, including rodents and birds, can cause reactions in people who are specifically allergic to these triggers and can make respiratory symptoms worse, causing increased congestion, sneezing, runny nose, chest tightness and wheezing).

Because a reasonable jury could find a sufficiently serious deprivation that caused injury on this record, summary judgment must be denied.

    C.    *Mr. Inman has established a Triable Issue Exists on Deliberate Indifference.*

The defendants also argue that Mr. Inman cannot demonstrate that they acted with deliberate indifference to his health or safety. On the subjective prong, a prisoner must show the defendant acted with deliberate indifference toward the inmate's health or safety. *Farmer*, 511 U.S. at 834. As this circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotation marks omitted); *see also Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (where inmate complained about severe deprivations but was ignored, he established a "prototypical case of deliberate indifference").

According to the defendants, the sanitation plan that was in place demonstrates that they were not deliberately indifferent. The court has already found that this plan, albeit in existence but on this record not followed, does not immunize the defendants. The sanitation reports also establish that there were ongoing problems with pigeons, mice, and roaches. ECF 61-1 at 459-667; ECF 70-1 at 1-5; ECF 72-1. If Mr. Inman's testimony is credited, then a reasonable jury could conclude that at least Assistant Warden Payne and Captain Boyan knew of the infestation and failed to take reasonable steps to remedy it. The evidence demonstrates that some effort was made to clean up the area months after

13

Mr. Inman filed a grievance, but a reasonable jury could conclude that the effort was too late, or so ineffective or inadequate as not to protect these defendants from liability.

        D.      *Assistant Warden Payne and Captain Boyan Are Not Entitled to Qualified Immunity.*

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (internal quotation marks and citation omitted). To overcome a qualified immunity defense, a plaintiff must show the deprivation of a constitutional right, and must also "show that the right was clearly established at the time of the violation." *Id.* "A right is clearly established when existing precedent has 'placed the statutory or constitutional question beyond debate.'" *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The plaintiff does not need to point to a case "on all fours" with the defendant's alleged misconduct; rather, there must simply be "settled authority that would cause him to understand the illegality of the action." *Id.* (citations omitted). In some cases, the two inquiries effectively collapse into one:

> A plaintiff claiming an Eighth Amendment violation must show the defendant's actual knowledge of the threat to the plaintiff's health or safety, the defendant's failure to take reasonable measures, and the defendant's subjective intent to harm or deliberate indifference. If there are genuine issues of fact concerning those elements, a defendant may not avoid trial on the grounds of qualified immunity. Likewise, if the uncontested facts reveal a fatal gap in the plaintiff's case, the defendant will win on the merits.

*Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (internal citations omitted).

Here, factual disputes exist as to whether Assistant Warden Payne and Captain Boyan knew of the infestation of pigeons, mice, and roaches, whether they took reasonable steps to eliminate the problem, and whether they were deliberately indifferent to the risks posed to Mr. Inman. Crediting Mr. Inman's version of events, he has shown a plausible Eighth Amendment violation, but "[t]he court cannot resolve disputed issues of fact when it addresses [whether the facts alleged describe a violation of a protected right] because the ordinary rules governing summary judgment apply in that

14

situation." *Mordi v. Zeigler*, 770 F.3d 1161, 1164 (7th Cir. 2014) (citations omitted). Thus, these two defendants cannot avoid trial on grounds of qualified immunity. *See Walker*, 293 F.3d at 1037 (recognizing that disputed material facts regarding the elements of an Eighth Amendment claim precludes dismissal based on qualified immunity). Mr. Inman's Eighth Amendment right was well established, and this circuit has specifically spoken to this precise issue in the past.

The defendants frame their qualified immunity argument in terms of "failing to recognize that an inmate is being housed in conditions that violate the Eighth Amendment having only been present for a 5-10 second conversation wherein an inmate yells into the hallway that he is being housed in inhumane conditions" and "failing to recognize that an inmate is being housed in conditions that violate the Eighth Amendment when approached twice over an eight month period of time by an inmate who asks if the mice are going to be taken care [of] violates the Eighth Amendment." ECF 64 at 14. In other words, the defendants have, in construing the issue, focused on their alleged lack of knowledge of the conditions. The court, however, has concluded that there is a triable dispute of fact concerning whether Assistant Warden Payne and Captain Boyan knew of the infestation.

Through this order, Warden Neal is further on notice of the need to redress any remaining or ongoing issue with excrement or infestation from mice, pigeons, or cockroaches at the Indiana State Prison. *See* ECF 61-1 (inspection reports since March 2018).

## CONCLUSION

For these reasons, the court GRANTS IN PART and DENIES IN PART the defendants' motion for summary judgment (ECF 63). Summary judgment is GRANTED to Warden Ron Neal, and DENIED to Assistant Warden George Payne and Captain Derek Boyan.

SO ORDERED.

February 7, 2020                                          *s/ Damon R. Leichty*
                                                                                     Judge, United States District Court